UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LISA CONNOLE,                          :
                                       :
        Plaintiff,                     :
                                       :
        v.                             :       CASE NO. 3:10CV1382(RNC)
                                       :
MICHAEL J. ASTRUE, COMMISSIONER :
SOCIAL SECURITY ADMINISTRATION, :
                                       :
        Defendant.                     :

RECOMMENDED RULING

        The plaintiff, Lisa Connole, brings this action pursuant to 42 U.S.C. § 405(g) against the Commissioner of Social Security ("Commissioner"), seeking judicial review of the Commissioner's denial of her application for disability benefits.  Pending before the court are the plaintiff's motion for an order reversing or remanding the case (doc. #7) and the defendant's motion for an order affirming the Commissioner's decision.  (Doc. #10.)  For the reasons that follow, the court recommends[1] that the plaintiff's motion be denied and the defendant's motion granted.

I.   Procedural Background

        In September 2008, the plaintiff applied for disability benefits alleging that she was disabled as of March 18, 2008 due to "chronic lumbar pain."  (R. at 119.)  The plaintiff's application was denied initially and on reconsideration.  There was a hearing before an ALJ at which the plaintiff appeared with a non-attorney

---

        [1]United States District Judge Robert N. Chatigny referred the motions to the undersigned for a recommended ruling pursuant to 28 U.S.C. § 636(b).  (Doc. #11.)

representative.[2]   (R. at 6-30.)   The plaintiff and a vocational
expert testified.   In March 2010, the ALJ, considering the case de
novo, found that the plaintiff was not disabled within the meaning
of the Social Security Act.   (R. at 34-51.)

## II.  Eligibility for Benefits

In evaluating disability claims, the Social Security
Administration follows a five-step process:

> First, the Commissioner considers whether the claimant is
> currently engaged in substantial gainful activity. If he
> is not, the Commissioner next considers whether the
> claimant has a severe impairment which significantly
> limits his physical or mental ability to do basic work
> activities. If the claimant suffers such an impairment,
> the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed
> in Appendix 1 of the regulations. If the claimant has
> such an impairment, the Commissioner will consider him
> [per se] disabled. . . . Assuming the claimant does not
> have a listed impairment, the fourth inquiry is whether,
> despite the claimant's severe impairment, he has the
> residual functional capacity to perform his past work.
> Finally, if the claimant is unable to perform his past
> work, the Commissioner then determines whether there is
> other work which the claimant could perform.

Selian v. Astrue, 708 F.3d 409, 417-18 (2d Cir. 2013).   "The
claimant bears the burden of proof in the first four steps of the
sequential inquiry."   Id. at 418.   At step five, "the burden shifts
to the Commissioner to show that there were a significant number of
jobs in the national economy that [the claimant] could perform
based on his residual functional capacity, age, education, and

---

[2]The plaintiff was represented by a Social Security
Representative employed by Allsup. (R. at 59.)

prior vocational experience." <u>Butts v. Barnhart</u>, 388 F.3d 377, 381 (2d Cir. 2004).

III. <u>Factual Background</u>

The plaintiff was born in 1963 and was forty-five years old in March 2008, when she alleges she became disabled.  From 1997 to March 2008, she was employed as a computer tech support person. (R. at 118.)

<u>Medical Evidence</u>

On January 3, 2007, the plaintiff saw Dr. Finno, M.D., complaining of low back pain.  (R. at 348.)  Her medications included Percocet, Diazepam, Effexor, Zyrtec and Zantac.  (R. at 349.)  An MRI of her lumbar spine from October 2006 showed some degeneration at the L4-5 and L5-S1 levels, with a very small protrusion at the L5-S1 level.  There was no sign of disc herniation or nerve impingement.  Dr. Finno noted that the plaintiff sat on the examining table without acute distress.  A straight leg raising test was negative.  (R. at 349.)  The plaintiff had full range of motion of her hips and walked with "a stable, nonantalgic gait."  Dr. Finno administered a lumbar epidural steroid injection.

A few weeks later, the plaintiff was seen by her primary care physician, Dr. Harris.  (R. at 408.)  An xray of her left shoulder showed no evidence of fracture, dislocation or radiopaque foreign body. (R. at 408.)  Dr. Harris noted she was "well appearing" and

decreased the dosage of Percocet.  (R. at 405 06.)

In April 2007, the plaintiff was seen for a "rash due to stress."  She was prescribed Prednisone. (R. at 404.)

On July 13, 2007, the plaintiff saw Dr. Harris for shoulder and low back pain.  She said she had "trouble working" and her job was stressful.  On examination, she had "multiple tender spots [on] shoulders and back." (R. at 403.)  Under "Plan," Dr. Harris wrote: leave of absence, increase rest, exercise and massage.  Dr. Harris prescribed Cymbalta and Percocet. (R. at 403.)  Later that month, the plaintiff returned to Dr. Finno complaining of back pain.  She was on disability and not working.  Dr. Finno explained that her MRI revealed "no significant findings."  His notes state "[u]nfortunately she is taking up to 3 Percocet" every day. (R. at 344.)  He recommended physical therapy.  (R. at 344.)

On August 27, 2007, the plaintiff told Dr. Harris that her back stability and balance had improved as had her shoulder but said she "still has bad days." (R. at 402.)  She was taking Percocet, Ibuprophen and Cymbalta.  Dr. Harris increased the dosage of Cymbalta.

In September 2007, the plaintiff told Dr. Finno that her overall function had "significant[ly] improve[d]" but her pain had not.  (R. at 341.)  Dr. Finno observed that the plaintiff sat on the examining table in no acute distress.  The plaintiff had "some trace end-range pain with forward flexion."  Straight leg raising

was negative and her neurological exam was normal.  Dr. Finno's assessment was "exacerbation of chronic low back pain."  He explained that her lumbar spine MRI showed "no significant disc herniation, sign of nerve impingement, canal stenosis or any cord abnormality."  He advised the plaintiff to return to work, exercise and stay active.  A week later, Dr. Harris noted that the plaintiff was "doing better."  (R. at 400.)  The plaintiff had localized tenderness with muscle spasm, excellent range of motion and decreased tenderness in lumbar area.  (R. at 400.)  Two months later, Dr. Harris observed that the plaintiff was "doing better," had good range of motion in her back and some lumbar tenderness. (R. at 370.)

In January 2008, the plaintiff returned to Dr. Harris.  She was working from home full time.  She had some "discomfort [in the] bilateral intrascapular area" and "ha[d] developed pain [in] left groin."  (R. at 368.)  She took Valium as needed, Soma 4 times a week and Percocet 2 - 3 times a day.  Dr. Harris's assessment was "left groin pull" and "muscle strain upper back."  (R. at 368.) Dr. Harris suggested massage, stretching exercises, heat and taking breaks during work.  (R. at 368.)  In February 2008, the plaintiff fell down some stairs.  Dr. Harris prescribed Oxycodone. (R. at 367.)  On March 7, 2008, she complained to Dr. Harris of persistent coccyx pain since her fall.  She also said she continued to have pain in her left groin. (R. at 225.)  On examination, the plaintiff

moved with "some difficulty" and had tenderness in her coccyx and left groin.  Dr. Harris's assessment was "chronic muscle strain left groin" and coccyx pain for which she recommended heat, massage and pain medication.  (R. at 225.)

The plaintiff fell again on March 14, 2008, after which she alleges that she became disabled.  (R. at 275.)  When seen by Dr. Harris on March 19, 2008, the plaintiff said that she was unable to work "due to pain, pain meds and depression."  (R. at 275.)  The plaintiff told Dr. Harris that she "wants to go on short term disability."  (R. at 275.)  Dr. Harris assessed the plaintiff with "chronic back pain/situational depression."  Under Plan, she wrote leave of absence - "had been on disability for same issue July - Oct" - and prescribed Oxycontin and Percocet.  (R. at 275-76.)

When seen a month later, the plaintiff moved with "some difficulty" and had bilateral lumbar tenderness.  (R. at 271.)  The plaintiff told Dr. Harris that she could drive if she did not take the Oxycontin.  Dr. Harris recommended that the plaintiff start physical therapy and decrease the Oxycontin, Valium and Soma.  (R. at 271.)

On April 23, 2008, the plaintiff had a physical therapy initial evaluation.  (R. at 198.)  The plaintiff told the therapist that "sitting and rotating in office chair causes pain", she could sit an hour with pain medication and only briefly without it and could walk 10-15 minutes with pain medication and 5 minutes

without.  (R. at 198.)  Upon examination, the plaintiff walked with
"mild trendelenburg gait/sway over R[ight] hip in stance phase."
(R. at 199.)  The physical therapist's impression was the plaintiff
presented with "low back pain possibly stemming from muscular and
sacroiliac joint dysfunction. [Patient] exhibits tight/tender
musculature, decreased strength and limited positional tolerances
with sitting and amb[ulating]."  The plaintiff's prognosis was
assessed as good.  (R. at 200.)

In May 2008, the plaintiff told Dr. Harris that her lower back
pain was "aggravated when she did yard work and when she picked up
the cat."  (R. at 269.)  She moved with difficulty and had
bilateral iliosacral joint tenderness.  Dr. Harris increased the
dosage of Oxycontin and opined that the plaintiff's weight (272
pounds) was hampering her rehabilitation efforts.  (R. at 269.)  In
June 2008, the plaintiff was seen for back and abdominal pain.  Dr.
Harris's impression was sciatica and constipation. (R. at 267.)
She prescribed Miralax and referred the plaintiff for a colonoscopy
and MRI.  (R. at 267.)

According to physical therapy notes dated July 2, 2008, the
plaintiff said that she was unable sleep due to pain.  She could
sit for 15 minutes and walk for 20 minutes. (R. at 194.)  Also in
July 2008, the plaintiff saw Dr. Wollin for complaints of bladder
overactivity.  (R. at 501.)  She said that she "has had urinary
frequency and leakage for the past 10 years" for which she had been

prescribed Detrol.  Dr. Wollin prescribed Vesicare and recommended
that the plaintiff stop taking Detrol.

A lumbar MRI in July 2008 revealed a "shallow right L2-L3
neural foraminal protrusion [that] does not significantly
compromise right L2 neural foramen.  L3-L4 tiny left posterolateral
upward directed disc extrusion is seen causing mild thecal
impression.  Minimal L5-S1 disc bulging does not cause significant
thecal impression."  (R. at 284.)  The plaintiff's sacrum MRI
revealed "no sacral abnormality, no sacroilitis . . . .  The first
and second coccygeal segments are slightly malaligned, separated,
minimal soft tissue fullness." (R. at 286.)

When seen by Dr. Harris on July 18, 2008, the plaintiff was
"upset that [her] MRI was normal."  (R. at 264.)  She insisted that
she is "unable to sit due to coccyx pain." (R. at 264.)  The
plaintiff was "tearful, leaning over table to support herself,
move[d] with difficulty, and [had] tenderness over coccyx."  Dr.
Harris's examination revealed that the plaintiff had "good range of
motion of her back."  (R. at 264.)  Dr. Harris increased the dosage
of Oxycontin.  (R. at 264.)  A week later, the plaintiff was
examined by Dr. Jurist, M.D., of the New England Hand Associates,
for her complaint of "right index finger pain."  She told Dr.
Jurist that she had the pain for two months.  (R. at 287.)  Dr.
Jurist noted that there was "a specific area of point tenderness
over the ulner digital nerve" and a "palpably thickened area that

moves with the nerve that is exquisitely tender." (R. at 287.)
The plaintiff had full range of motion of the finger. Xrays
confirmed that there was no bone or joint abnormality. (R. at 287.)

In August 2008, the plaintiff told her physical therapist that
she had "decreased sitting tolerance and pain with passing bowel
movement." (R. at 290.) Also that month, she was examined by Dr.
Krims, a gastroenterologist, for her complaints of constipation and
epigastric pain. (R. at 515.) The plaintiff's colonoscopy was
normal. (R. at 514.) Dr. Krims recommended Miralax. On August
15, 2008, the plaintiff was seen by Dr. Harris. The plaintiff said
that despite physical therapy, she had not had significant
improvement in her coccyx pain. Her shoulder pain had improved
with the use of a TENS unit (Transcutaneous electrical nerve
stimulation). (R. at 358.) According to Dr. Harris's notes, the
plaintiff moved with some difficulty and had lumbar and coccyx
tenderness. She had improved lateral flexion. (R. at 358.)

In September 2008, the plaintiff was examined by Dr. Finno.
(R. at 177.) Dr. Finno observed that the plaintiff sat on the
examining table with no acute distress. He noted she had "some
distal tenderness on the coccygeal region." Her neurological exam
was normal. Dr. Finno's assessment was "distal low back
pain/coxodynia" and "mild chronic low back pain." (R. at 177.) He
administered a sacrococcygeal joint block and recommended that she
continue physical therapy and "stay as active as she can." (R. at

178.)  Later that month, the plaintiff told Dr. Finno that she did not have improvement from the injection and continued to have low back pain.  (R. at 175.)  The plaintiff sat on the examining table in no acute distress.  Dr. Finno noted that she walked "with a stable, nonantalgic gait" and had "some tenderness over the coccygeal region."  He recommended that the plaintiff use a doughnut when sitting and ice the affected area.  (R at 175.)

The plaintiff's physical therapy ended in October 2008, after 16 sessions of physical therapy.  She had not improved.  (R. at 180.)  The plaintiff told her physical therapist that she continued to have "severe coccyx pain with passing BM."  According to the plaintiff, she could sit 30 minutes with shifting.  (R. at 181.)  When seen by Dr. Harris on October 8, 2008, the plaintiff said that she had not had improvement from the cortisone injections to her coccyx.  She stretched several times per day and had pool therapy twice a week but without significant improvement.  (R. at 257.)  The TENS made her coccyx pain worse.  The plaintiff said that she was taking Oxycontin three times a day and Oxycodone four times s week but they did not "completely help pain."  (R. at 257.)  On examination, she "move[d] with difficulty" and "support[ed] herself on exam table." She had tenderness bilaterally over the lumbar area and coccyx.  Dr. Harris told the plaintiff to exercise more, lose weight and return in two months for a followup appointment.

On October 15, 2008, Dr. Bernstein, M.D., an agency physician,

reviewed the plaintiff's medical records and completed a Physical Residual Functional Capacity Assessment for the SSA. (R. at 414.) Dr. Bernstein opined that the plaintiff could frequently lift and carry 10 pounds and occasionally 20 pounds; stand and/or walk at least 2 hours and sit about 6 hours in an 8-hour day and had no limitations in the ability to push and/or pull. Dr. Bernstein stated that "[o]besity and chronic low back pain limit standing/walking to 3 - 4 hours/8 hr day. She may use a cane as needed for balance and stability." (R. at 415.) Dr. Bernstein determined that the plaintiff occasionally could climb stairs, balance, stoop, kneel and crouch but never climb ladders or crawl. She had no visual, manipulative or environmental limitations with the exception of avoiding hazards. (R. at 416.) Dr. Bernstein found that the plaintiff's allegations regarding the severity of her symptoms were "not fully credible" when compared to objective medical records. (R. at 419.)

Dr. Harris referred the plaintiff to Dr. Rosenberg, D.O., of the Spaulding Rehabilitation Center. When seen on October 29, 2008, the plaintiff complained of back and coccyx pain. (R. at 209.) She indicated that she suffered from gastrointestinal problems but "[d]enie[d] any bladder problems." (R. at 209.) Dr. Rosenberg observed that the plaintiff's sacral MRI was "essentially normal." (R. at 209.) He noted that the plaintiff was in no acute distress and walked into the examining room with a mild antalgic

11

gait. (R. at 210.)  Dr. Rosenberg observed that "internal and external rotation of bilateral hips are full and pain free. Lumbar flexion is full.  Lumbar extension now produces increased pain. There is tenderness to palpation on lumber paraspinal musculature bilateral as well as severe tenderness to palpation over the gluteus medius and piriformis musculature on the left . . . . There is a decrease in the lumbar lordosis."[3]  (R. at 210.)  The plaintiff underwent a trial of trigger point injections in October and November 2008.  (R. at 208, 210.)

In November 2008, the plaintiff had a consultative psychological evaluation by Dr. Kathleen Murphy, Ph.D.  Dr. Murphy observed that the plaintiff remained seated throughout the evaluation and was not restless or fidgety.  (R. at 447.)  She maintained good eye contact.  Her concentration was average and her judgment and insight were below average.  The plaintiff said she slept 5 to 6 hours a night.  She said she "cannot return to [her] job" because she cannot sit "for more than thirty minutes."  (R. at 447.)  She began experiencing panic attacks in 1998.  They "involve dizziness, heart palpitations, arm numbness, nausea and the need to urinate."  The plaintiff was prescribed Diazepam.  The plaintiff said that the attacks are "pretty controlled" and occur "every few months."  Her last panic attack was a month ago.  (R. at 447.)  The

---

[3]Lumbar lordosis is the normal, anteriorly convex curvature of the lumber segment of the vertebral column.  Stedman's Medical Dictionary 119 (28th ed. 2006).

plaintiff has not been in counseling since 1998.  The plaintiff said she "drives regularly."  She puts clothes in the washing machine but cannot take them out because she cannot "bend that low."  She folds the clothes and puts them away. (R. at 448.)  "She is independent in cooking."  "Her husband does most of the grocery shopping.  Occasionally she walks with him while he grocery shops."  (R. at 448.)  On a typical day, she takes her medication, does stretching exercises, eats lunch, watches TV or reads.  She goes to a pool every other day to exercise.  (R. at 448.)  Dr. Murphy's diagnostic impression was "panic disorder without agoraphobia reported in partial remission."  (R. at 448.)  The plaintiff's GAF was assessed as 59.

On December 11, 2008, the plaintiff saw Dr. Harris.  She reported that she had had "some improvement in right hip area pain" but had "persistent left shoulder, low back and coccyx pain."  (R. at 241.)  She also complained of a recurrent rash in her gluteal cleft.  The plaintiff was in no acute distress and had normal range of motion in her left shoulder.  (R. at 242.)  Dr. Harris's assessment was chronic low back pain and coccyx pain.  (R. at 242.)  The plaintiff's medications included Zantac, Oxycontin, Oxycodone, Soma, Ambien, Nasonex, Astelin nasal spray, Ibuprofen, Valium, Zyrtec and Cymbalta. (R. at 241).  Later that month, the plaintiff saw Dr. Alavi, a colorectal surgeon, for an ulcer on her intergluteal cleft. (R. at 213.)  Dr. Alavi noted that the

13

plaintiff was "healthy, in no apparent distress."  "Anorectal examination reveals normal perianal skin.  Digital exam demonstrates normal tone."  (R. at 213.)  On palpation of the coccyx, she had "very exquisite significant pain and discomfort." Examination of the intergluteal cleft revealed a shallow ulcer in the midline.  Dr. Alavi determined that the wound was healing and did not require treatment.  (R. at 214.)

On December 29, 2008, John J. Warren, Ed. D., completed a Psychiatric Review Technique form for SSA based upon his review of the medical records.  He analyzed the plaintiff's impairment under category 12.06 for anxiety-related disorders.  (R. at 464.)  He found that the plaintiff's allegations were "primarily somatic" and that although she had a "history of anxiety symptoms, [they were] generally well controlled with anxiolytic medication. . . . Functional limitations attributable to mental impairment are not severe."  (R. at 476.)  He opined that the plaintiff had a mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace and no episodes of decompensation.  (R. at 474.)

In January 2009, the plaintiff had her "annual follow-up for her sleep-ordered breathing."  (R. at 299.)  She reported that she was "compliant with CPAP" and kept "her CPAP mask on for 8 to 10 hours at night."  (R. at 299.)  Dr. Ayub advised her to continue

14

using her CPAP machine nightly and lose weight.

The plaintiff returned to Dr. Alavi in February 2009.  She presented as "generally healthy" and "in no apparent distress." (R. at 219.)  He opined that the gluteal cleft ulcer was a result of skin breakdown and told her to keep the area clean and dry. Later that month, the plaintiff told Dr. Harris that her "buttock pain ha[d] resolved."  (R. at 237.)

When seen on April 30, 2009, the plaintiff told Dr. Harris that she "would be unable to perform any job now as [she is] unable to sit comfortably."  (R. at 234.)  Dr. Harris observed that the plaintiff had "excellent" range of motion in her back and bilateral lumbar tenderness.  (R. at 235.)  Dr. Harris assessed the plaintiff with chronic low back pain, coccyx pain and decubitis ulcers.  (R. at 235.)  She thought the plaintiff should "continue the current management" and consider a stress reduction program.

On May 9, 2009, the plaintiff saw Dr. Alavi for her complaint of "anal pain."  (R. at 217.)  Dr. Alavi remarked that it was "very difficult to get a good history from her and get a good idea of exactly where this pain has been coming from but based on what she [says] the pain appears as most severe during a bowel movement. She describes it as sharp and excruciating."  He observed that "she is currently lying in her side in severe discomfort; however, when you talk to her and particularly after we were completed, her pain appears to have not been as bad as it initially presented.  That

15

being said, she is obviously distraught about not finding solutions
to her complaint." (R. at 217.)  Dr. Alavi found that the plaintiff
"is generally healthy in mild to moderate distress with pain lying
on her side." (R. at 217.)  He thought the plaintiff's pain might
be related to an anal fissure and recommended fluids, fiber
supplements and a high fiber diet.

On May 13, 2009, Dr. Virginia Rittner, M.D., a state agency
physician, completed a Physical Residual Functional Assessment.
(R. at 479.)   Like Dr. Bernstein's prior residual functional
capacity assessment, Dr. Rittner opined that the plaintiff could
frequently lift and/or carry 10 pounds, occasionally lift and/or
carry 20 pounds, stand and/or walk at least 2 hours in an 8-hour
work day and sit about 6 hours.  Dr. Rittner explained that the
plaintiff could stand/walk 3-4 hours and that "cane use" should be
"allowed for all ambulation." (R. at 480.)  The plaintiff had an
unlimited ability to push and/or pull and could occasionally climb
ramps/stairs, balance, stoop, kneel, and crouch.  She could never
crawl or climb ladder/rope/scaffolds. (R. at 481.)  Dr. Rittner
found that the plaintiff had no manipulative limitations and no
environmental limitations with the exception that she "avoid
concentrated exposure to hazards." (R. at 482-83.)

Also on May 13, 2009, Dr. Lindsay Harvey, Ph.D., completed a
Psychiatric Review Technique form.  As did Dr. Warren, she analyzed
the plaintiff's impairment under category 12.06 for anxiety-related

disorders.  (R. at 492.)  Dr. Harvey found that the plaintiff's panic disorder without agoraphobia was not a severe impairment and opined that the plaintiff had a mild restriction of activities of daily living, mild difficulties in maintaining social functioning and mild difficulties in maintaining concentration, persistence or pace.  The plaintiff had no episodes of decompensation. (R. at 487, 492, 497.)  Dr. Harvey opined that the plaintiff's anxiety symptoms "are well controlled" by medication and "her functional limitations can be attributed to her physical complaints."  (R. at 499.)

On June 7, 2009, the plaintiff returned to Dr. Alavi for "anal pain."  Dr. Alavi noted that previously it seemed that the plaintiff might have "a fissure-in-ano, however, when you question her further, it is not her fissure that really causes her pain.  It is more sitting for extended periods with significant pressure buildup."  (R. at 212.)  Dr. Alavi indicated that there was not much he could do for her and suggested she see a neurologist "to see if they can offer her any additional comfort or have any additional tests that may help her with regards to her pain.  At this juncture really what she is experiencing is a chronic pelvic pain syndrome type picture probably irritated by a disrupted sacrococcygeal joint from her recent trauma and which then initiates a spasm."  (R. at 212.)

On June 25, 2009, Dr. Harris completed a Physical Capacities Evaluation form for SSA.  (R. at 221.)  According to Dr. Harris,

the plaintiff could frequently lift and carry 10 lbs and occasionally 20 lbs and could sit 2 hours and stand/walk 1 hour during an 8 hour work day. She required "an opportunity to alternate sitting and standing at will throughout the day." The plaintiff could grasp with her hands, push and pull, perform fine motor manipulation, use her hands for repetitive motion tasks (such as writing, typing and assembly) and use her feet for repetitive movements. (R. at 221.) She could occasionally balance, stoop, kneel, crouch, crawl, and reach above shoulder level. She could never climb. (R. at 222.) The plaintiff had a moderate restriction of activities involving unprotected heights, being around moving machinery, driving automotive equipment and exposure to dust, fumes and gases. She had no restriction of activities involving exposure to marked changes in temperature and humidity. Dr. Harris opined that the plaintiff was unable to work even in a sedentary position due to pain and fatigue. (R. at 222-23.) As explanation, Dr. Harris wrote that the plaintiff had lower back pain, coccygodynia[4], and left shoulder pain and that "chronic pain causes fatigue." (R. at 222-23.) Dr. Harris found that the plaintiff's attention and concentration were "moderate[ly]" affected by pain and/or side effects of medication. (R. at 224.)

On July 9, 2009, the plaintiff was seen by Dr. Sundar, a

---

[4]Coccygodynia is a synonym for coccydnia, which means "pain in the coccygeal region." Stedman's Medical Dictionary 403 (28th ed. 2006)

neurologist.  The plaintiff reported that her low back pain started in October 2006, "shoots down to the buttocks" and is not associated with any difficulty with walking or changes with balance.  (R. at 519.)  She also has "pain in the tailbone."  The plaintiff said she had a longstanding history of urinary symptoms but that her frequency had improved with medication and was now 5 - 6 times a day.  (R. at 518-19.)  Examination showed no focal motor or sensory deficits.  Dr. Sundar observed that her "[r]eflexes are quite brisk" in both upper and lower extremities.  (R. at 519.) Her strength "is close to 5/5 upper and lower extremity all muscle groups."  (R. at 519.)  She was able to walk on her toes and heels and her straight leg raising test was negative.  (R. at 519.)  Dr. Sundar's impression was "1. low back pain, possibly lumbar radiculopathy, no weakness or sensory deficits. [N]o evidence of cauda equina compression. 2.  Radiation of pain to the left thigh anteriorly and to lateral thigh, which is probably secondary to compression of the lateral cutaneous nerve of thigh. 3. Coccydynia, perhaps related to previous coccygeal injury."  He also noted that she has sleep apnea and that her symptoms were stable.  He prescribed Neurontin and recommended she return in 3 -4 months.  (R. at 519.)

In mid-July 2009, the plaintiff went to the emergency room due to an exacerbation of back pain.  (R. at 509.)  When seen by Dr. Harris later that month, the plaintiff said she was "back to

baseline" but that her range of motion was still limited.  (R. at 509.)  She was "doing home exercises."  On physical examination, the plaintiff moved with some difficulty and had tenderness in the lumbar area. (R. at 510.)  The plaintiff told Dr. Harris she wanted to "switch pain meds as Oxycontin no longer available in generic" and in response, Dr. Harris prescribed MS Contin.

On August 5, 2009, Dr. Rosenberg completed a Physical Capacities Evaluation form for SSA.  (R. at 503.)  He indicated that the plaintiff could frequently lift and carry 10 pounds and occasionally 20 pounds, could sit for 2 hours and stand/walk for 2 hours.  She could use her right hand to push and pull and engage in fine manipulation but not her left hand.  The plaintiff could use both feet for repetitive movements.  She frequently could balance, occasionally stoop, kneel, crouch, crawl and reach above shoulder level and never climb.  (R. at 504.)  She had no restrictions of activities involving "exposure to marked changes in temperature and humidity" and "exposure to dust, fumes and gases."  She was moderately restricted in "driving automobile equipment."  (R. at 504.)  Dr. Rosenberg opined that the plaintiff was unable to work even in a sedentary position due to pain and fatigue. (R. at 504, 506.)  As explanation, the report stated that the plaintiff "requires sleep aids and pain medication to function," which "cause fatigue."  (R. at 504.)  Dr. Rosenberg found that the plaintiff's attention and concentration were moderately affected by pain and/or

side effects of medication.   (R. at 505.)   On each page of the evaluation, Dr. Rosenberg wrote that the information contained therein was "as per patient report."

In September 2009, the plaintiff was examined by Dr. Mazin, an orthopedic surgeon.   The plaintiff's lumbar spine range of motion was "limited to 25% in all planes with axial pain on all end-ranges of motion."   (R. at 303.)   A straight leg raise test was negative bilaterally.   Her sensation to light touch was intact.   Manual muscle testing was 5/5 (normal).   Dr. Mazin noted the plaintiff had tenderness to palpation diffusely about the lumbar spine and the posterior sacroiliac spine bilaterally.   She also had tenderness at her tailbone and "at her sacrum in the midline."   (R. at 303.)   Dr. Mazin opined that the plaintiff's "lumbar spine symptoms are likely secondary to discogenic low back pain and her tailbone pain is consistent with coccydynia. [T]here does appear to be diffuse pain all about her lumbar spine and sacrum and I believe that there is a significant psychosocial component which is amplifying her perception of pain."   (R. at 304.)   Dr. Mazin did not think the plaintiff should have "further interventional spine care or coccygeal injections."   He discussed her medications with her and "let her know that should she feel that she required these medications that she would need to discuss this with her primary care physician."   (R. at 304.)

On October 30, 2009, the plaintiff told Dr. Harris that she

was walking 15 minutes a day and doing "ball" core exercises 45 minutes a day.  (R. at 507.)  Dr. Harris recommended reducing the dosage of Soma and increasing aerobic exercise.

<u>Plaintiff's Testimony</u>

The plaintiff lives in a two story home.  Her bedroom is upstairs and at times she has difficulty using the stairs.  (R. at 9.)  She is 5'3" and weighed 281 pounds at the time of the hearing.  (R. at 10.)  She gained 50 pounds since she stopped working in 2008.  (R. at 9.)  Her weight does not affect her mobility.  (R. at 17.)  She is unable to work because she "can't sit."  (R. at 17.)  Her pain is "always there."  (R. at 12.)  The plaintiff's pain medication makes her feel "kind of like loopy" and affects her memory.  (R. at 13.)  She rarely drives.  (R. at 16.)  Her husband does all the laundry.  (R. at 15-16.)  On good days, she showers, gets back into bed, gets up and walks or does stretches with a ball, naps, goes downstairs to get lunch, naps after lunch, gets up to go the bathroom, gets back in bed to watch tv or read.  She has "bad" days five days a week.  On those days, she only gets out of bed to go to the bathroom.  (R. at 15.)  She can sit for 30 minutes, stand 15 minutes and walk 15 to 20 minutes.  (R. at 16.)  She cannot walk around a grocery store.  The plaintiff's asthma is "not that bad" and she uses an inhaler "only if necessary."  (R. at 20.)  She has a cane which she has used "for a couple of years."  (R. at 22.)  She cannot use the middle finger on her left hand

22

"very well" due to an old injury but it did not prevent her from doing her former job. (R. at 23.) The plaintiff has gluteal cleft ulcers that make sitting painful. (R. at 24.) The plaintiff disagreed with Dr. Murphy's observation that she did not have any difficulty remaining seated. According to the plaintiff, it was "very difficult to sit in that chair" during the evaluation and she was "moving around in th[e] chair." (R. at 21.) She even asked Dr. Murphy if there was something else she could sit on but Dr. Murphy was "adamant" that the plaintiff had to "sit there."

IV.  <u>ALJ's Decision</u>

Following the five-step sequential evaluation process, the ALJ first determined that the plaintiff had not engaged in substantial gainful activity since March 18, 2008. (R. at 39.) At step 2, the ALJ found that the plaintiff has the following severe impairments: degenerative disc disease, coccyx injury status post fall, residual effects of left hand injury, gluteal cleft ulcerations/wounds and obesity. (R. at 39.) The ALJ also found that the plaintiff suffers from impairments of asthma, sleep apnea, incontinence and panic disorder but that they were not severe because they "result in minimal, if any, limitations in the claimant's ability to perform work-related activities." (R. at 40.) At step 3, the ALJ concluded that the plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments found in 20 C.F.R., Part 404, Subpart P,

Appendix 1. (R. at 40.)  The ALJ next determined that the plaintiff has "a residual functional capacity to perform light work, as defined in 20 C.F.R. § 404.1567(b), except that she is able to lift 10 pounds frequently and 20 pounds occasionally; sit 6 hours in an 8 hour workday, stand and/or walk for 3 hours in an 8 hour workday with a sit/stand option; she is limited to occasional climbing of stairs and ramps, no ropes, ladders, or scaffolds, occasional balancing, stooping, kneeling, crouching no crawling; frequent fingering with the left hand, no exposure to moving parts or unprotected heights.  Additionally, she is limited to jobs involving simple routine, repetitive tasks with short, simple instructions and with an attention span to perform simple work tasks for 2 hour intervals throughout an 8 hour workday." (R. at 41.)  In so concluding, the ALJ considered the plaintiff's allegations of disabling symptoms but determined that her statements concerning the intensity, persistence and limiting effects of her symptoms were not wholly credible. (R. at 43.)  The ALJ considered the opinions by Drs. Rosenberg and Harris that the plaintiff was disabled due to fatigue and pain but accorded their opinions little weight because "their opinions were inconsistent with their own findings and the overall medical evidence of record" and because Dr. Rosenberg's report was based on the plaintiff's subjective description of her limitations. (R. at 44.)  The ALJ found that the opinions of the state agency physicians were

consistent with the medical evidence and as a result, gave "great weight" to their assessments.  (R. at 44.)  At step 4, the ALJ concluded that the plaintiff was unable to perform her past relevant work.  At step 5, the ALJ found that the plaintiff could perform other work, including three representative occupations identified by the vocational expert of an assembler (DOT #706.684-022), a hand packer (DOT #920.685-078) and a security guard (DOT #372.667-034).  (R. at 45.)  Accordingly, the ALJ concluded that the plaintiff was not disabled under the Social Security Act from March 18, 2008 through March 25, 2010, the date of the ALJ's decision.  (R. at 46.)

V.   Standard of Review

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error."  Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996).  "Under this 'very deferential standard of review,' 'once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise.'"  Bonet ex rel. T.B. v. Colvin, --- Fed. App'x ----, 2013 WL 3214890 (2d Cir. June 27, 2013).  See, e.g., Selian

25

v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) ("If there is substantial evidence to support the [agency's] determination, it must be upheld.").

VI. <u>Discussion</u>

The plaintiff argues that the decision should be reversed because the ALJ erred in evaluating her impairments, assessing her credibility, failing to give controlling weight to her treating physicians' opinions and determining her residual functional capacity.[5]

<u>Severity of Impairments</u>

The plaintiff argues that the ALJ committed reversible error by not finding as severe impairments: chronic knee pain following ACL surgery, plantar fasciitis of the right foot, trochanteric bursitis, a right index finger injury, left shoulder pain, "left thigh nerve compression", urinary dysfunction, panic attacks, constipation, GERD, chronic muscle strain of the left groin, chronic pelvic pain syndrome, myofascial pain syndrome, chronic upper back strain, sleep apnea and skin disorder/rashes.

At step two of the sequential evaluation process, the ALJ must determine whether the claimant has "any impairment or combination of impairments which significantly limits [the claimant's] physical

---

[5]The plaintiff also argues that the case should be remanded because of factual errors made by the ALJ.  The court construes the alleged factual errors as arguments that the ALJ lacked substantial evidence to support his assessments of the plaintiff's credibility, treating physicians' opinions and residual functional capacity.

or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). An impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings." 20 C.F.R. § 404.1508. The plaintiff "has the burden of providing medical evidence which demonstrates the severity of her condition." Merancy v. Astrue, No. 3:10cv1982(WIG), 2012 WL 3727262, at *7 (D. Conn. May 3, 2012).

According to the plaintiff, the ALJ should have found her "chronic knee pain" and "plantar fasciitis (right foot)" are severe impairments. The record reveals that the plaintiff self-reported these issues to her treaters. (R. at 198, 209, 251, 288, 324, 349, 446, 508, 518.) There is, however, no indication in the record that these conditions affected her ability to perform work-related activities. The same is true of the plaintiff's "trochanteric bursitis" and "right index finger pain,"[6] each of which appears only a few times in the medical record. (R. at 212, 287.)

The plaintiff also argues that her left shoulder pain and "left thigh nerve compression" are severe impairments. Although these appear in the record as diagnoses, "[t]he mere diagnosis of an impairment says nothing about the severity of the condition." Burrow v. Barnhart, No. 3:03CV342(TPS), 2007 WL 708627, at *6 (D.

_____

[6]To be severe, the impairment must satisfy a durational requirement of twelve months. 20 C.F.R. § 404.1509. The record does not indicate that the plaintiff's finger problem met this threshold.

Conn. Feb. 20, 2007).   The record reveals that the plaintiff's complaints were episodic.   The few entries by her treaters during the relevant time period fail to establish that the plaintiff was under a severe impairment.  See Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983)("The [Commissioner] is entitled to rely not only on what the record says, but also on what it does not say.").

The plaintiff also challenges the ALJ's assessment of her incontinence because the ALJ made "no specific findings concerning how often [the plaintiff] is incontinent or how often she must leave a work site to urinate or clean herself." (Pl's Mem. at 24.) As the ALJ noted, the record reveals that the plaintiff's incontinence was effectively treated with medication.   The plaintiff told Dr. Sundar that her frequency improved to 5 - 6 times a day. (R. at 519.) Substantial evidence supports the ALJ's finding that the plaintiff's incontinence was not a severe impairment.

The plaintiff also argues that the ALJ improperly assessed the plaintiff's panic attacks.   (Pl's Mem. at 22.)   The record indicates that the plaintiff's panic attacks date back to 1998 and by her own admission, were effectively controlled with medication. (R. at 447.)   Both Drs. Warren and Harvey opined that the plaintiff's anxiety was not a severe impairment.  (R. at 464, 487.) Substantial evidence supports the ALJ's finding that this impairment does not significantly limit her ability to do basic

28

work activities.

As to the plaintiff's "chronic constipation", GERD, and chronic muscle strain of the left groin, there is nothing in the record that would support a finding that these conditions in any way limited the plaintiff's ability to do basic work activities. See Malloy v. Astrue, No. 3:10cv190(WIG), 2010 WL 7865083, at *14 (D. Conn. Nov. 17, 2010) (ALJ did not err where "there is no indication in the 400 pages of medical records that Plaintiff's GERD affected his ability to perform work-related activities in any way whatsoever. Indeed, Plaintiff himself never mentioned it as a problem during his testimony before the ALJ nor did he list it as a disabling condition in the disability reports that he completed.")

The plaintiff's argument as to her "chronic pelvic pain syndrome" also fails.  To the extent that the plaintiff argues that this diagnosis is distinct from her coccygeal problem, there is nothing in the record to support such a distinction. The plaintiff's medical records also contain diagnoses of "myofascial pain syndrome" (R. at 526), "muscle strain upper back" (R. at 368) and "chronic upper back pain" (R. at 227).  Similarly, to the extent that the plaintiff contends that these are impairments discrete from the back problems already recognized by the ALJ, she points to nothing that would support such a distinction.

With regard to the plaintiff's sleep apnea, the ALJ correctly

observed that the plaintiff used a CPAP machine and that this impairment was nonsevere.   Substantial evidence supports this finding.  (R. at 299, 519.)

The plaintiff states that she also suffers from "skin disorders which cause itchy and occasionally oozing rashes on various parts of her body."  She contends that such a rash "would be likely to bother co-workers or customers," would limit her to jobs that do not deal with the public and might would affect her productivity.  (Pl's Mem. at 25.)  The plaintiff's arguments are purely speculative.   There is nothing in the medical record to support that the plaintiff's "skin disorders" "significantly limit[]" her ability to do basic work activities.

The plaintiff next argues that the ALJ failed to properly consider the functional effects of her obesity pursuant to SSR 02-1p.

"Obesity is not in and of itself a disability." Guadalupe v. Barnhart, No. 04-CV-7644, 2005 WL 2033380, at *6 (S.D.N.Y. Aug. 24, 2005).  "However, the ALJ is required to consider the effects of obesity in combination with other impairments throughout the five-step evaluation process, taking into account the claimant's residual functional capacity assessment." Smith v. Astrue, No. 10-CV-6018(NGG), 2013 WL 1681146, at *4 (E.D.N.Y. Apr. 17, 2013). See Tracy v. Astrue, No. 09-CV-953S, 2011 WL 3273146, at *5 (W.D.N.Y. July 29, 2011)("Obesity must be considered at multiple

stages of the sequential evaluation process.")

The ALJ considered the plaintiff's obesity in accordance with SSR 02-1p.  At step 2, the ALJ found the plaintiff's obesity was a severe impairment.  The ALJ next "considered the cumulative effects of the claimant's obesity on her other impairments, as required by SSR 02-1p and its effect on her ability to adjust to work and sustain work activity on a regular and continuing basis" and "determined that the claimant's obesity does not preclude her ability to perform work within her residual functional capacity." (R. at 40.)  In so concluding, the ALJ adopted the findings of Dr. Bernstein, who expressly incorporated the effect of obesity into the plaintiff's residual functional capacity.  See Drake v. Astrue, 443 Fed. App'x 653, 657 (2d Cir. 2011) ("[T]he ALJ implicitly factored [the plaintiff's] obesity into his RFC determination by relying on medical reports that repeatedly noted [the plaintiff's] obesity and provided an overall assessment of her work-related limitations."); Talavera v. Comm'r of Soc. Sec., No. 06-CV-3850 (JG), 2011 WL 3472801, at *12 (E.D.N.Y. Aug. 9, 2011) (ALJ properly considered the plaintiff's obesity where, inter alia, ALJ "listed obesity as one of [plaintiff's] [severe] impairments" and "there was substantial evidence supporting the ALJ's implicit determination that [plaintiff's] obesity would not preclude her performing the sedentary, low-stress jobs identified"), aff'd, 2012 WL 4820808 (2d Cir. 2012).

31

The plaintiff also argues that the ALJ failed to assess the plaintiff's impairments in combination.  The ALJ did not err.  The ALJ's decision makes clear that he considered the "combination of impairments" and the combined effect of "all symptoms" in making his determination.  (R. at 40.)  As a result, the ALJ's step three and step four analysis sufficiently assessed the plaintiff's combination of impairments.  Seekins v. Astrue, No. 3:11CV00264(VLB)(TPS), 2012 WL 4471266, at *7 (D. Conn. Aug. 14, 2012).

Credibility

The plaintiff argues that the ALJ erred in assessing her credibility.

An "ALJ's credibility determination is generally entitled to deference on appeal." Selian v. Astrue, 708 F.3d 409, 420 (2d Cir. 2013).  "The ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).  In determining the credibility of a claimant's statements, the ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record." SSR 96-7p, 1996 WL 374186,

at *1.

The ALJ did not discount entirely the plaintiff's statements regarding her symptoms - rather, the ALJ found that she was "partially credible" as a result of her "good work history". (R. at 43.)  In his analysis of the credibility of the plaintiff's subjective complaints, the ALJ noted reports that she could sit on an examining table in no acute distress, her negative straight leg raising tests, MRI results, and her ability to walk with a stable, antalgic gait. (R. at 42.)  The ALJ cited results from a July 2009 examination where she had "full strength in upper and lower extremities, normal gait, negative straight leg raising results, no focal, motor or sensory deficits and her reflexes were quite brisk." (R. at 42.)  He considered Dr. Mazin's observation that the plaintiff's perception of pain was amplified by "a significant psychosocial component."  The ALJ also noted Dr. Alavi's finding that after speaking to her for awhile, the plaintiff's pain did not appear to have been as bad as initially presented. (R. at 43-44.)  The ALJ compared Dr. Murphy's observation of the plaintiff's ability to remain seated during the evaluation with the plaintiff's description of the incident, and concluded that he found "it hard to believe that Dr. Murphy would have observed but not reported pain behaviors or a specific request for a different chair based on difficulty sitting." (R. at 42.)

The plaintiff argues that the ALJ should not have considered

33

Dr. Murphy's description of her during the evaluation because Dr. Murphy, a psychologist, "is not trained . . . in the recognition of pain behaviors." (Pl's Mem at 29.)  This is not reversible error. The ALJ did not rely on Dr. Murphy as an expert in "pain behaviors."  Rather, he merely mentioned that the plaintiff's account differed from Dr. Murphy's account and that Dr. Murphy likely would have noted the plaintiff's discomfort and request for another chair.  The plaintiff points to no authority that ALJ is precluded from crediting a witness's observation.

The plaintiff next argues that the ALJ failed to cite findings supporting her disability (such as positive straight leg raise tests.)  The plaintiff also points to the ALJ's statement that the plaintiff experienced "some improvement" as a result of the trigger point injections and argues that it is incorrect because the plaintiff did not enjoy any "sustained improvement." (Pl's Mem. at 29.)  This does not constitute reversible error.  The ALJ did not find that the plaintiff realized sustained relief from treatment. To the contrary, he observed that notwithstanding the injections, "the claimant continued to complain of chronic lower back and gluteal region pain." (R. at 42.)  As to the plaintiff's straight leg raise tests, the ALJ is not "required to discuss every piece of evidence submitted," Bonet ex rel. T.B. v. Colvin, --- Fed. App'x ----, 2013 WL 3214890, at 1 (2d Cir. 2013) nor "reconcile explicitly every conflicting shred of medical testimony." Galiotti

v. Astrue, 266 Fed. App'x 66 (2d Cir. 2008).

The plaintiff also argues that the ALJ should have accorded her "substantial" credibility in light of her work record.  In support, the plaintiff cites to Rivera v. Schweiker, 717 F.2d 719, 725 (2d. Cir. 1983) for the proposition that a claimant with a good work record is entitled to "substantial credibility."

Rivera "does not mean, however, that an ALJ must find the allegations to be credible even if the medical record does not support a finding of a claimant's disability." Diaz v. Astrue, No. 3:11CV00317(TPS), 2012 WL 3903388, at *7 (D. Conn. Aug. 2, 2012). The ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010).  A claimant's work history "is just one of many factors that the ALJ is instructed to consider in weighing the credibility of claimant testimony." Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998).

The ALJ's evaluation of the plaintiff's credibility was properly based on inconsistencies between her subjective complaints and the substantial evidence in the record.  See Kennedy v. Astrue, 343 Fed. App'x 719, 722 (2d Cir. 2009) (no error where ALJ found that the claimant's testimony as to the intensity, duration, and limiting effects of impairment was contradicted by the record as a

whole).  Substantial evidence supports the ALJ's conclusion that the plaintiff's testimony with respect to the intensity, persistence, and limiting effects of her symptoms was not entirely credible.  As a result, the plaintiff was not entitled to a presumption of substantial credibility based on her work history. See Stanton v. Astrue, 370 Fed. App'x 231, 235 (2d Cir. 2010)(claimant not entitled to substantial credibility for good work history "because substantial evidence aside from work history supports the adverse credibility ruling"); Diaz v. Astrue, No. 3:11CV00317(TPS), 2012 WL 3903388, at *8 (D. Conn. Aug. 2, 2012)("The ALJ's finding of a 'fairly good work history' does not automatically supersede the ALJ's discretion to weigh various components of the record. Overall, the ALJ sufficiently evaluated Plaintiff's testimony and statements based on her fairly good work history and was not required to assign 'substantial credibility' to Plaintiff's allegations that she can no longer work.")

Treating Physician

The plaintiff next argues that the ALJ should have accorded controlling weight to the opinions of Drs. Harris and Rosenberg that she was disabled.

"[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

the other substantial evidence in [the] case record.'" Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008).  The ALJ considers several factors when evaluating how much weight to assign to a treating physician's opinion, including the length and nature of the treatment relationship, frequency of examination, his or her specialization, and the supportability and consistency of the opinion. 20 C.F.R. § 404.1527(d).

The ALJ did not err in declining to accord controlling weight to the opinions of Drs. Harris and Rosenberg.  Their opinions were not supported by objective medical evidence and treatment records. See 20 C.F.R. § 404.1527(d)(4) (consistency with the record as a whole is a key factor in assessing medical opinion evidence).  The plaintiff's treatment reports revealed essentially normal neurological function as evidenced by full or nearly full motor strength, symmetrical reflexes, and intact sensation. (R. at 177, 303, 519.)  The ALJ noted both the plaintiff's negative straight leg tests and her October 2009 report that she was walking 15 minutes and doing ball core exercise every day. (R. at 42.)  Her MRI results showed "[m]inimal L5-S1 disc bulging does not cause significant thecal impression." (R. at 284.)  Her "sacral MRI was essentially normal." (R. at 209.)  The plaintiff walked "with a stable, nonantalgic gait" and sat on the examining table without difficulty during her appointments. (R. at 175, 177, 209, 341, 349.)  Dr. Mazin opined that plaintiff's perception of pain was

amplified by a psychosocial component.  (R. at 304.)  Moreover, as the ALJ noted, Dr. Rosenberg's opinion was expressly based on the plaintiff's assessment.  "While a claimant's self-reported symptoms are certainly an essential diagnostic tool, that does not automatically transform them into medical opinion."  Burden v. Astrue, 588 F. Supp.2d 269, 276 (D. Conn. 2008).  See Baladi v. Barnhart, 33 Fed. App'x 562, 564 (2d Cir. 2002) (treating physician's opinions need not be given controlling weight when "treating physician's opinions were based upon plaintiff's subjective complaints of pain and unremarkable objective tests").  Finally, the opinions of Drs. Harris and Rosenberg were inconsistent with the opinions of the state agency medical consultants, Drs. Rittner and Bernstein.  See Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993)(opinions of non-examining sources can override the treating sources' opinions provided they are supported by evidence in the record).  Accordingly, the ALJ did not err in rejecting the opinions of Drs. Harris and Rosenberg.  See Roma v. Astrue, 468 Fed. App'x 16 (2d Cir. 2012) (ALJ was not required to defer to treating physician's opinion where it was inconsistent in material respects with other substantial evidence including findings by state agency physicians); Kennedy v. Astrue, 343 Fed. App'x 719, 721 (2d Cir. 2009)(ALJ properly declined to give controlling weight to treating physician's opinion when it was not corroborated by contemporaneous treatment notes).

The plaintiff adds an argument that the ALJ should not have relied on the opinions of Drs. Rittner and Bernstein because they "lack credentials." (Pl's Mem. at 34.)  This claim of error is unavailing. "There is no regulation that requires a non-examining doctor to be a specialist or board-certified in the area of medicine that governs the claimant's impairment." Cyr v. Astrue, No. 3:10cv1032(TPS), 2011 WL 3652493, at *11 (D. Conn. Aug. 19, 2011).

Residual Functional Capacity

Finally, the plaintiff argues that the ALJ's mental residual functional capacity assessment was vague and insufficiently detailed.

The ALJ found that "[c]onsidering her allegations of diminished concentration due to pain, [the plaintiff] is restricted to jobs involving simple routine, repetitive tasks with short, simple instructions and with an attention span to perform simple work tasks for 2 hour intervals throughout an 8 hour day." (R. at 43.)

The plaintiff bears the burden of establishing her residual functional capacity. 20 C.F.R. § 404.1512(c). In this case, two state agency reviewing physicians opined that the plaintiff's mental impairments were not severe. (R. at 464, 486.) After a psychological evaluation, Dr. Murphy's diagnostic impression was "panic disorder without agoraphobia reported in partial remission."

(R. at 448.)  Drs. Harris and Rosenberg opined that the plaintiff's attention and concentration were moderately affected by pain and/or side effects of medication.  In light of the record, the ALJ's mental residual functional capacity assessment was sufficiently specific and properly based on the complete record.  There is no reversible error.

The plaintiff next argues that the ALJ erred in assessing her residual functional capacity because the ALJ did not include all the limitations from her impairments.[7] (Pl's Mem. at 36.)  She contends that the ALJ "made no specific findings concerning the frequency, severity and duration of" her panic attacks and did not include restrictions based on her asthma and allergies.  The ALJ did not err.  The plaintiff stated, and the ALJ found, that the plaintiff's panic disorder dated back many years and was "pretty controlled" with medication.  (R. at 40.)  As to her asthma and allergies, there is no indication in the medical records that the they affected her ability to perform work-related activities.  Indeed, the plaintiff herself never mentioned it as either as a problem in the disability reports that she completed.  During the hearing, the plaintiff said that her asthma was "not that bad" and

---

[7]To the extent that the plaintiff argues that the ALJ erred by not including limitations in her residual functional capacity caused by her various ailments, see pl's mem. at 36, substantial evidence supports that these conditions, discussed supra, did not result in any work-related limitations.  Without any evidence of limitations, there was no reason for the ALJ to even mention them in the residual functional capacity assessment.

that she only occasionally used an inhaler.  By her own account in
Dr. Rosenberg's report, she had no restrictions of activities
involving exposure to dust, fumes and gases.  (R. at 504.)

The plaintiff argues that the ALJ erred in not including that
she has a "significant limitation of her ability to handle or
manipulate objects" because of the impairments to her left hand and
right index finger, her rashes "caused by her skin ailments or
because of the ointments she must use to combat them."  She posits
that "[h]er hands and fingers might be too weak, too stiff, or too
slippery to grasp, hold or manipulate objects." (Pl's Mem. at 38.)
The ALJ did not err.  The plaintiff herself stated that she was
able to use her hands.  (R. at 150.)

The plaintiff argues that the ALL erred because her residual
functional capacity does not include "her need for a cane."[8]  (Pl's
Mem. at 38.)  This is not reversible error.  Although the record
contains references to the use of a cane, there is no evidence that
she is unable to ambulate effectively without one.

The plaintiff argues that the ALL included a sit/stand option
in the residual functional capacity but did not define the
"sit/stand option."  This claim of error also is unavailing.  The

---

[8]The plaintiff points out that the ALL made a factual error in
his statement that the plaintiff "stated that she used a
handicapped walker since 2002." (R. at 42.)  The transcript
reflects that she said she has handicapped parking permit.  The
plaintiff has not demonstrated how this factual error affects the
outcome of her case.  The court finds that no cause for reversal.

41

ALL's decision states that "the undersigned finds that the claimant should have the option to sit/stand at will." (R. at 43.) She also argues that the ALL "contradicts himself" by stating that she has an unlimited sit/stand option but limiting her sitting to 6 hours. The sit/stand option and the limitation on the plaintiff's ability to sit are not incompatible.

VII. Conclusion

For these reasons, the plaintiff's motion to reverse or remand (doc. #7) should be denied and the defendant's motion to affirm (doc. #10) should be granted.

Any party may seek the district court's review of this recommendation. Failure to object might preclude appellate review. See 28 U.S.C. § 636(b) (written objections to proposed findings and recommendations must be filed within fourteen days after service of same); Fed. R. Civ. P. 6(a), 6(d) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Thomas v. Arn, 474 U.S. 140, 155 (1985); Small v. Secretary of Health and Human Services, 892 F.2d 15, 16 (2d Cir. 1989) ("failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision").

Dated this 9th day of July, 2013 at Hartford, Connecticut.

_____/s/_____
Donna F. Martinez
United States Magistrate Judge